## McClay *v.* HICKS.

1. Malicious Prosecution—Probable Cause—Evidence.
   · Upon a review of the testimony in an action for malicious prosecution, it was *held* that the question whether defendant had probable cause for making the complaint upon which the action was based was properly left to the jury.

2. Same—Advice of Prosecutor.
   In an action for malicious prosecution, evidence by the prosecuting attorney that the defendant did not, at the time of entering complaint, make full disclosure of the facts to him, is inadmissible, even though defendant gave notice with his plea that he would show advice of the prosecuting attorney after a full statement of the facts, if, upon the trial, he expressly disclaims having relied upon such advice.

3. Same—Instructions.
   In an action for malicious prosecution, where the facts are in dispute, the court should state hypothetically what facts, if found, would constitute probable cause, and not leave the jury to determine the question under a general definition.

Error to Alpena; Kelley, J. Submitted October 5, 1898. Decided December 28, 1898.

Case by Elizabeth McClay against Charles V. Hicks for malicious prosecution. From a judgment for plaintiff, defendant brings error. Reversed.

*J. D. Turnbull*, for appellant.

*Dafoe & Gustin*, for appellee.

Montgomery, J. This is an action for malicious prosecution. Defendant caused the arrest of the plaintiff on a charge of statutory larceny. On her examination before the justice of the peace who issued the warrant, she was discharged. It appeared on the trial of the present case

that a warrant for the arrest of the plaintiff was issued on complaint of the present defendant; that, after the arrest, the defendant stated to the officer that, if plaintiff would return the property which it was charged she had appropriated, he would not prosecute her. The property in question was an organ. The evidence as to the manner in which it came into plaintiff's possession was conflicting. Defendant testified that he sold plaintiff a piano, and took from her an organ in part payment, allowing her $90 for the organ; that, after the piano had been in plaintiff's possession for some time, the plaintiff told him she could not pay for the piano, and asked him to give her an organ in place of the one she turned in; that he agreed to give her a second-hand organ, and that he sent one to her house; that she refused to receive this organ, and, at an interview between the parties, plaintiff stated that she wanted an organ similar to the one she had before, and would be willing to pay the difference; that no bargain was made at this interview; that defendant agreed to send up an organ, with the statement, "We will see what the difference will be;" that he did send up the organ in question, and afterwards went up and asked her $40 difference; that plaintiff then stated that she did not know how she could pay for the organ, unless a relative would help her out; that the matter was allowed to rest for some two months; that she then told him the relative referred to could not help her, and that she could not see any way to pay for it, but would like to keep the organ for a while; that he then told her he had no use for the organ for a while, and that she could have the use of it until he called for it; that he subsequently learned that the house of plaintiff was vacant, and on inquiry learned that plaintiff had taken an early boat one morning.

The plaintiff's testimony accords with defendant's, up to the point when the organ was sent to the house, which she refused to accept. As to what took place between the parties thereafter, she testified as follows:

"After talking a little while, he said that he had another

one down at the store that he would give me, and I asked him, 'What difference?' He told me that he would send that one up, and I could see it, and it was a good organ. But it was a second-hand organ. It wasn't as good as mine, that I let him have. I asked him what difference he wanted. He said, 'Forty dollars.' I told him no, I couldn't give it to him. He asked me if I hadn't somebody—my brother or some relation—to help me pay it. I told him no. And I distinctly refused to give him the $40 difference.

"*Q.* What did he agree to do, before he went away?

"*A.* He said he would go down; he would send that one up, anyway; he didn't want to beat me out of the organ; I had had trouble enough. And he sent up the organ that same afternoon, and the organ was in my possession from that time up to the time I was arrested. From the time he went away and sent up the organ, Mr. Hicks never came to me in reference to that organ at all, and never asked me about the organ afterwards. That was between the 10th and middle of January, 1896. I was then living at 508 Washington avenue. * * * At that time I didn't tell him to tell Mr. Hicks I would pay the difference between that and a good organ. I did tell him I would have been willing to pay a little difference and get my own organ back. * * * Mr. Hicks wished me to pay a difference of $40, and I refused. I refused before he sent up the organ. I told him I didn't want to buy an organ. This was the day he sent up the organ,— before he sent it up. When I talked with Mr. Hicks about the $40, I supposed he meant a new organ. I told him I didn't want to buy an organ now, and I refused distinctly to pay him the $40.

"*Q.* Now, then, I want the conversation. What else was said?

"*A.* I refused distinctly to give him $40.

"*Q.* What did you say to him?

"*A.* I don't know as I can tell you.

"*Q.* Tell me just what you said to him.

"*A.* I cannot.

"*Q.* You cannot?

"*A.* No, sir; not the whole conversation.

"*Q.* Did he say anything more to you about the organ at that time, except what you told me?

"*A.* He told me he had one down there; he would send it up; I had had trouble enough; he didn't intend to beat me out of the organ.

"*Q.* After he got through, when he asked you for the $40, and you said you didn't know whether you could pay it, what did he say then about sending that one up?

"*A.* He told me that he would send that one down in the store up.

"*Q.* The understanding between you and him then was, you expected, if he sent it up, you was to pay him the $40?

"*A.* No, sir; I didn't.

"*Q.* Did you expect at that time he was going to send you,—to donate that $40 to you?

."*A.* No, sir; I expected him to give it to me in place of mine.

"*Q.* He told you he should want a difference of $40 between those organs, didn't he?

"*A.* He said that they wanted more than that,—the difference in the piano.

"*Q.* I say, he said that to you?

"*A.* He asked me that first, and I refused it.

"*Q.* Do you want this jury to understand that he donated to you the difference of $40, by agreement with you at that time?

"*The Court:* I don't see, Mr. Turnbull— The witness has distinctly stated the conversation. He said he had an organ down there he would send up; he wanted the difference,—wanted her to pay him $40, and she declined to do it. Before he went away, he told her he would send that organ up anyway.

"*Mr. Turnbull:* Yes.

"*The Court:* She has given the whole conversation.

"*Q.* That is all the conversation you had with him about this organ?

"*A.* Yes; he went away, and the organ came up in half an hour,—half or three-quarters of an hour. Hicks never came up afterwards to see about the organ. He never visited my house at all to see about it."

We have quoted this testimony at length, for the reason that it is claimed by counsel for the appellant that the evidence conclusively shows that there was probable cause for making the complaint. It will be seen, however, that the plaintiff's version of what took place at the time of the delivery to her of the organ in question is susceptible of a construction which leads to the conclusion that it was intended that the title to the organ should vest in plaintiff.

This being so, it was for the jury to construe the testimony and determine the fact.

One Daggett testified that at one time plaintiff inquired of him what Mr. Hicks could do if she moved the organ away, and that he replied that Hicks could replevy it wherever he found it. This testimony is not denied in terms, and it is urged with much force that this testimony, taken in connection with plaintiff's, shows that plaintiff did not understand that the title to the organ passed to her, and that, if the title is shown to have been in defendant, the conversion by plaintiff was such as authorized an inference of guilt. It must be admitted that this testimony is strongly corroborative of defendant's theory, but we are not prepared to say that it established that theory conclusively. It was entitled to be weighed by the jury, but there was no express admission by plaintiff of want of title, and it was not conclusive on that question.

It is also claimed that there was error in admitting negative testimony by the prosecuting attorney, to the effect that defendant did not tell him of the original transaction at the time the piano was sold to plaintiff, at the time the complaint was made. The defendant had offered no testimony as to the advice of the prosecuting attorney, and the failure to disclose these facts would appear to have been immaterial. Its reception was objected to, and plaintiff attempted to justify its admission on the ground that defendant attached a notice to his plea that he would show advice of the prosecuting attorney, after a full statement of all the facts. This testimony was offered in rebuttal, after it was apparent that defendant did not rely upon the advice of the prosecuting attorney; and the defendant's counsel, in answer to a question from the court, stated that he did not rely upon the advice of the prosecuting attorney. We think this was error. The testimony had no tendency to disprove any fact shown in the case, and was calculated to distract the attention of the jury from the real questions.

The charge of the circuit judge was, in the main, fair and clear, but in one respect it failed to submit the issue

to the jury in the manner which the law points out for this class of cases. Upon the question of probable cause the court instructed the jury as follows:

"Now, as to what will constitute probable cause, or want of it, I charge you that 'probable cause' consists and means that state of facts which would move a man of reasonable prudence and caution to prosecute, or to suspect and complain and prosecute, under similar circumstances. It is the only standard by which we can determine in cases of this kind what probable cause is. 'Probable cause' means—probable cause for making a complaint or instituting a criminal prosecution means—a state of facts known to the person who makes the complaint, and believed to be true, and which would move or actuate a reasonably cautious or prudent man to act and make the complaint under similar circumstances, and with similar knowledge of the facts. This is the only definition that I can give you. And I apprehend that you will comprehend it and understand it in applying it to this case."

It will be seen that the charge does not point out what facts would constitute probable cause, but leaves the jury to determine the question according to their best judgment. One vice of such an instruction lies in the fact that it, of necessity, leaves the jury to determine for themselves what constitutes the offense for which plaintiff was prosecuted. Until the jury know the elements of the offense, it is impossible for them to determine intelligently whether the knowledge of certain facts by defendant justified him in making the complaint. This could only be determined when it was known whether the certain facts which defendant knew, or had reasonable proof of, tended to show an offense in law. The question of what constitutes probable cause in a particular case has for this reason, among others, been treated as a mixed question of law and fact; and correct practice requires that, where the facts are in dispute, the court shall state hypothetically what facts, if found, would constitute probable cause. *Hamilton* v. *Smith*, 39 Mich. 222; *Rankin* v. *Crane*, 104 Mich. 6.

The judgment is reversed, and a new trial ordered.

The other Justices concurred.